**In re Anonymous No. 59 D.B. 77**

To the Disciplinary Board of the Supreme Court of Pennsylvania:

HENRY, *Vice-Chairman*, March 29, 1979— Hearing Committee [ ] being [ ], Esq., chairman, [ ], Esq. and [ ], Esq., file the following report with regard to the foregoing matter:

## HISTORY OF THE CASE

Respondent, [ ], is charged in a petition for discipline with violating Rules 1-102(A)(5), 1-102(A)(6) and 6-101(A)(3), of the Code of Professional Responsibility.

The petition was served on respondent on December 22, 1977. No answer to the petition was filed within 20 days of service and the charges were therefore deemed to be at issue. One hearing was held before the committee on April 19, 1978, in the office of Disciplinary Counsel, District [   ], Suite [   ], [   ], [   ], Pa. The notes of testimony were transcribed and transmitted to the chairman of the Hearing Committee.

Petitioner, in support of the petition, presented the testimony of seven witnesses and introduced into evidence 26 exhibits identified as Exhibits P-1 to P-26 inclusive.

In the process of cross-examination, certain exhibits were marked for identification purposes by respondent, being Exhibits R-1, R-2, R-3 and R-4A, R-4B, R-4C and R-4D. Exhibits R-1, R-2 and R-3 were not offered in evidence. Exhibits R-4A, B and C were offered and, over objection, were admitted.

At the conclusion of petitioner's case, respondent's counsel advised the hearing panel that, in his opinion, no case of professional misconduct had been made out and, hence, respondent would present no evidence.

## II. ALLEGED VIOLATIONS OF THE CODE OF PROFESSIONAL RESPONSIBILITY

a.  D.R.-1-102(A)(5): A lawyer shall not engage in conduct that is prejudicial to the administration of justice.

b.  D.R.-1-102(A)(6): A lawyer shall not engage in conduct that adversely reflects on one's fitness to practice law; and

c.  D.R.-6-101(A)(3): A lawyer shall not neglect a legal matter entrusted to him.

## III. FINDINGS OF FACT

1. Mr. and Mrs. [A] (the [As]) were the owners of a house and six acres of ground located in [ ] Township, [ ] County, Pa., which property was subject to a bond and mortgage in favor of the Bank of [ ] (the bank).

2. The [As] having defaulted in their mortgage payments, received a letter dated April 3, 1975, from [Attorney B] who was handling the bank's mortgage matters for his father, [Attorney C], who was counsel to the bank. They were advised that foreclosure proceedings would be instituted if they did not pay some $1,895.16 of past due payments, escrow funds and late charges.

3. Thereupon the [As] listed their property for sale on April 7, 1975, with [D] Realty for 30 days. [D] found no buyer nor did [D] show the house to anyone.

4. On May 7, 1975, the [As] listed the house and three acres of the property with [E] Realty for a period of 90 days, who showed the property to three people, but no offers were accepted.

5. On June 20, 1975, one [F] offered to buy the three acres of ground (not the house) for a price of $6,000 and tendered a check for $500 down money and signed an informal agreement of sale.

6. On July 28 or July 29, 1975, the [As] were served with a complaint in mortgage foreclosure, which complaint indicated a total sum due the bank of $43,354.14, and contained a notice to plead within 20 days of service.

7. Mr. [A], on July 29 or July 30, 1975, consulted respondent (who had previously represented [A] in another matter), asked for his help and gave him a copy of the complaint in mortgage foreclosure. Re-

spondent agreed to represent the [As] and discussed the need to sell the property.

8. The [E] Realty listing agreement expired on August 6, 1975, and the next day [A] ran an ad offering the house and three acres for sale at a price of $60,800.

9. On August 15, 1975, respondent wrote to the bank's counsel, indicating that [A] had no defense, that no answer would be filed, that there were no agreements of sale outstanding, but that several promising prospects were in the offing. Respondent concluded by saying "after you have obtained judgment . . . I would appreciate hearing from you."

10. On August 20, 1975, [G] made an offer to buy the house and three acres of ground for $60,800, with $500 to be paid down, and he thereupon tendered to Mr. [A] a check for the down money.

11. At about this time, [F] advised [A] he wanted to complete his purchase of the other three acres of ground and tendered his check for $2,000 down on the $6,000 purchase price of the other three acres.

12. On August 20, 1975, [A] took the checks of [G] and [F] to respondent and asked him to prepare the two sales agreements. Respondent said "I'll get right on it."

13. [A] picked up the [F] sales agreements from respondent's secretary on August 27, had them signed, and then returned them to respondent's secretary the next day. At that time, respondent advised [A] that the [G] agreement for the purchase of the house had not been drawn, but "not to worry about it."

14. Judgment in mortgage foreclosure was entered on August 27, 1975, and notice thereof mailed to the [As] the same date.

15. Shortly afterward, Mr. [A] took a job in [H] and communicated this fact to respondent, who reported that "everything was fine, not to worry about it."

16. Thereafter, on September 4, 1975, instructions to the sheriff of [ ] County were given to levy upon and sell the [A] real estate in connection with the bank's mortgage foreclosure.

17. On September 8, 1975, the bank's counsel, [Attorney B], wrote respondent that a sheriff sale of the [A] property would be held on October 10, 1975, and that the [As] could cure their default prior to sale.

18. On September 15, 1975, a sheriff's levy on the personal property was made on behalf of the Bank of Virginia (another creditor) whereupon [A] called respondent who said "he would get right into it" and also advised [A] he had better come back and get the [G] agreement signed.

19. [A] did return and did get the [G] agreement signed, the agreement having been picked up from respondent's office by [A]'s son.

20. The agreement between the [Gs] and the [As] for the purchase of the house and three acres of ground, which had been prepared by respondent, had provided for a settlement on or before November 15, 1975, with an additional extension of 30 days if all of the conditions had not yet been met.

21. [A] testified he gave the signed [G] agreement to respondent on September 17, although the agreement is dated September 22, 1975. Whereupon respondent encouraged [A] to "go ahead to [H]. Don't worry again about anything. I will handle everything." He also handed respondent the per-

sonal property sheriff sale notice, issued at the behest of the Bank of Virginia.

22. [Attorney B] attempted several times, unsuccessfully, to call respondent to learn what was happening regarding the possible sale of the [A] real estate.

23. Respondent finally called [Attorney B], after the intervention of [Attorney C], who called respondent's law partner, and a meeting was scheduled for the Tuesday prior to the date of the proposed sheriff sale.

24. By letter dated September 15, 1975, respondent wrote to [Attorney B], expressing distress that the property was listed for sale, that he had prepared and sent out, for execution, an agreement of sale on the property, and offered to send photostatic copies of the same if desired. The letter also expressed the belief that the settlement would net sufficient funds to pay all existing liens of record, including the bank's mortgage. The letter also asked for assurance in writing that the property would not be sold at sheriff sale on October 10, 1975.

25. A meeting was held in the [B & C] office October 7, 1975, attended by respondent, [Attorney B], [Attorney C] and the loan officer of the bank, to which meeting respondent brought both agreements of sale.

26. The bank loan officer expressed skepticism concerning the agreements of sale by reason of a subdivision condition in one agreement and the purchasers' condition of prior sale of their own house in one agreement.

27. It was finally agreed to postpone the sale for one month if the [As] would pay the outstanding

costs to date, estimated to be $400, and provided such payment was made by Friday of that week.

28. Respondent called [A] by telephone in [H] that the sale of the real estate could be stayed for $400, and that [A] should send him that sum.

29. On October 15, 1975, [Attorney B] instructed the sheriff to notify the [As], in [H] of the sale to take place on November 7, 1975, it having been continued from October 10th.

30. On October 15, 1975, respondent wrote to [Attorney B], forwarding the $400 check, and furnishing him with the [A's] [H] address.

31. By letter of October 30, 1975, [Attorney B] acknowledged receipt of the $400 and asked when settlement would take place.

32. [Attorney B] tried to reach respondent by telephone on November 5, and left word for him to call back.

33. Respondent made no communication to [Attorney B] between October 15 and the sheriff sale on November 7, 1975.

34. The sheriff sale took place on November 7, 1975, and the [A] property was sold for $46,601 to [   , Esq.] attorney for [E] Realty, Inc.

35. During the week following the sale respondent called [Attorney B] to inquire "why did you sell the property on Friday." The substance was that he believed he had an extension other than to November 7. In the same telephone conversation [Attorney C] confirmed [Attorney B's] statement that the extension was only to the November sale.

36. The sheriff's distribution policy showed that the mortgage balance and other charges to the bank totaled $46,600.

37. The [Gs] entered into an agreement for the purchase of the [A] property, being the house and six acres, from [E] Realty for a price of $66,300. The

sale on this agreement was settled on December 12, 1975.

38. Subsequently, the [Gs] sold the three acres of ground to the [Fs] for $5,500.

## IV. DISCUSSION

The petition for discipline covers three charges, all of them arising out of respondent's failure to timely pursue and protect the rights of one [A] in relation to forestalling or avoiding the mortgage foreclosure and sheriff sale of [A's] property.

At the commencement of the hearing, counsel for respondent made two general objections:

1. First, that counsel had not been furnished with unpublished opinions of the Disciplinary Board, including opinions rendered recommending dismissal, despite his request for same; and

2. Second, that respondent's counsel had made certain demands for discovery of correspondence which passed between the complaining witness, [A], and Disciplinary Counsel. These objections were overruled, and the hearing proceeded.

The panel is in agreement that, while evidence of neglect exists which would give rise to an actionable claim for malpractice, the neglect was not so serious, blatant or long-standing as to amount to a breach of the Code of Professional Responsibility, and to require the imposition of discipline. Stated another way, the hearing panel is of the view that not every instance of neglect requires the imposition of discipline.

It must be conceded that respondent should have obtained a written confirmation of the precise terms of the sheriff sale continuance. It is possible that [Attorney B] might have confirmed, in writing, the understanding, but he did not do so.

On the facts disclosed by this record, we feel that no discipline should be assessed, and recommend that the petition should be dismissed.

## ORDER

And now, March 29, 1979, the report and recommendation of the Hearing Committee filed October 13, 1978, finding that no violation had been established and that the petition for discipline be dismissed, is accepted; and it is ordered and decreed that the charges against respondent be dismissed.